IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| WELLINGTON EMANUEL CLARKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-902-ECM-SMD |
| | ) | |
| WARDEN BUTLER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

## I.    INTRODUCTION

Plaintiff Wellington Clarke, proceeding pro se and in forma pauperis, filed this action under 42 U.S.C. § 1983 during his incarceration at the Ventress Correctional Facility.[1] *See* Docs. 1, 2. The Complaint names as defendants Ventress Correctional Facility ("Ventress") Warden Reosha Butler, Easterling Correctional Facility Warden John Crow, former Alabama Department of Corrections ("ADOC") Commissioner Jefferson Dunn[2], Assistant ADOC Commissioner Cheryl Price,[3] Wexford Health Administrator Celeste Hunter, and Wexford Health Sources, Inc. ("Wexford"). Doc. 1. Clarke seeks damages and injunctive relief for Defendants' alleged failure to provide him with adequate

---

[1]  Clarke was released from custody during the pendency of this action. *See* Doc. 57.

[2]  John Hamm has replaced Jefferson Dunn as Commissioner for the Alabama Department of Corrections. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Hamm thus is automatically substituted as a defendant in his official capacity. Former Commissioner Dunn remains a defendant in his individual capacity. The Clerk of Court is DIRECTED to update the docket sheet accordingly.

[3]  Misspelled in the Complaint as "Sherry Price."

protection from COVID-19 in violation of his Fourteenth and Eighth Amendment rights. *Id.* at 2–9.

Defendants filed Answers and Special Reports with supporting evidentiary materials (i.e., affidavits, medical records, prison documents), addressing Clarke's claims. Docs. 10, 17, 25. The Court directed Clarke to respond with affidavits, sworn or verified declarations, or statements made under penalty of perjury, and other evidentiary materials. Doc. 26 at 2. Clarke filed responsive material. *See* Doc. 37 .

The Court previously informed the parties that it may, at any time after the deadline for Clarke to file a response and without further notice, treat the special reports and any supporting evidentiary materials as motions for summary judgment and rule on the motions in accordance with the law after considering any response filed. Doc. 26 at 3. Pursuant to that disclosure, the Court now deems it appropriate to treat the reports filed by Defendants as motions for summary judgment and concludes the motions are due to be granted.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant shows there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the record as a whole could lead a reasonable trier of fact to find for the nonmoving party … . [A fact] is 'material' if it might affect the outcome of the case under the governing law." *Redwing Carriers, Inc. v. Saraland Apartments*, 94 F.3d 1489, 1496 (11th Cir. 1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has satisfied that burden, the nonmovant is required to cite portions of the record showing a genuine dispute of material fact. *Id*. at 324. The nonmovant, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). To establish a genuine dispute of material fact, the nonmovant must produce evidence such that a reasonable trier of fact could return a verdict in its favor. *See Waddell v. Valley Forge Dental Assocs., Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Summary judgment also should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

In determining whether a genuine dispute of material fact exists, the court must view all of the evidence in a light most favorable to the nonmovant and draw all justifiable inferences from the evidence in the nonmovant's favor. *See McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003); *see also* Fed. R. Civ. P. 56(a). "At the summary judgment stage, this Court should accept as true "statements in [plaintiff's] verified complaint, [any] sworn response to the [defendant's] motion for summary judgment, and sworn affidavit attached to that response[.]" *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019); *see also United States v. Stein,* 881 F.3d 853 (11th Cir. 2018) (holding that a plaintiff's self-serving and uncorroborated, but not conclusory, statements in an affidavit or deposition may create an issue of material fact which precludes summary

judgment); *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253 (11th Cir. 2013) (quotation marks and citation omitted) (observing that "[t]o be sure, [plaintiff's] sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage. . . . Courts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving."). However, general, blatantly contradicted and merely "[c]onclusory, uncorroborated allegations by a plaintiff in [his verified complaint or] an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported summary judgment motion." *Solliday v. Fed. Officers*, 413 F. App'x 206, 207 (11th Cir. 2011) (*citing Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)); *see also Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (holding that conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine dispute of material fact); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## III.   RELEVANT FACTS[4]

The following facts derive from Clarke's verified Complaint (Doc. 1), the sworn or verified evidentiary materials proffered by Defendants (Docs. 16-1 through 16-5; Docs.

---

[4] The "facts" set forth herein are merely for purposes of resolving summary judgment and may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir.), *opinion modified on reh'g*, 30 F.3d 1347 (11th Cir. 1994) ("[W]hat we state as 'facts' … for

17-1 through 17-5; Docs. 24-1 through 24-4[5]), and Clarke's response to Defendants' filings (Doc. 37).

Clarke was incarcerated at Ventress when he filed suit on November 6, 2020. Doc. 1 at 2. He sues Defendants over their response to the global COVID-19 pandemic which he contends resulted in violations of his Fourteenth Amendment right to equal protection, and his Eighth Amendment right to be free from cruel and unusual punishment.[6] *Id.* at 2– 9.

Central to Clarke's Complaint is Defendants' alleged failure to take adequate COVID-19 measures and precautions. Doc. 1. Although Clarke does not state he had contracted COVID-19 when he initiated suit, he alleges that transferring infected inmates to Ventress made it "a very unsafe place" thus exposing him to an unreasonable and serious risk of harm. *See id.* at 5. Clarke also alleges that Ventress is so  overcrowded that inmates sleep less than four feet from one another, temperatures in his dorm range from 98° to 102°, and that he must sit shoulder to shoulder with other inmates while in the dining hall making Ventress "an incubator for growing bacteria and diseases." Doc. 1 at 6. Finally, Clarke

---

purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.").

[5] In their special report, Defendants Dunn, Price, Butler, and Crow aver that they adopt the factual statements contained in their response (Doc. 24) to Clarke's request for preliminary injunctive relief and the evidentiary materials submitted in support thereof (Docs. 24-1 through 24-4). *See* Doc. 25 at 1.

[6] Throughout the Complaint, Clarke maintains that his Eighth and Fourteenth Amendment rights have been violated by Defendants' conduct. *See generally* Doc. 1. He also states that the Fourteenth Amendment "gives [him] the right to the equal protection of the law." *Id*. at 5. Thus, the Court will treat Clarke's *pro se* pleading liberally and, in an abundance of caution, construe it as attempting to state a Fourteenth Amendment equal protection claim in addition to an Eighth Amendment deliberate indifference claim.

alleges that "[b]ecause [Ventress] was not set up to keep [the] COVID-19 patients that were sent here, they were put wherever they could put them, and now it is in my dorm." *Id.* For relief, Clarkes requests: (1) over $1,200/day beginning from June 25, 2020 (the date Clarke claims the first COVID-19 inmates were transferred to Ventress), "until the camp/prison is COVID-19 free;" (2)  $200,000 from Defendants Dunn and Price for their negligence in transferring COVID-19 patients to Ventress; (3) $500,000 from Wexford for pain and suffering, emotional, mental, and psychological stress, and fear of contracting the virus and dying; (4) the court instruct "Warden Butler to be more careful next time[] and call the C.D.C. if anyone tries to put a virus in her camp;" and (5) the court direct Warden Crow "not to release anyone for transfer that has a serious disease or virus that can cause death in another camp;"[7] and *Id*. at 11–12.

In response, Defendants concede that six inmates who tested positive for COVID-19 were transferred from Easterling to Ventress in or around July 2020. Doc. 24-3 at 2; *see also* Doc. 17-1 at 2–4. However, they maintain these inmates were housed under medical quarantine in a specific, designated location that facilitated medical isolation; the inmates'

---

[7] Clarke also sought a preliminary injunction "for the state to send all the COVID-19 patients back to the camp they came from, and not to send more to Ventress." Doc. 1 at 10. However, Clarke's motion for a preliminary injunction was denied prior to this Recommendation. *See* Docs. 27, 30. And because Clarke is no longer incarcerated (*see* Doc. 57), his requests for injunctive relief, including any requests for prospective injunctive relief, are moot. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974)) (finding that past injury "'does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects.'"); *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (citation and quotation marks omitted) (observing that, "[l]ogically, a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past").

movements were restricted to prevent them from coming into contact with other inmates; and prison officials have taken, and continue to take, extensive actions to protect inmates and staff from the spread of COVID-19 at Ventress and throughout all ADOC facilities. Doc. 24-3 at 2–4; Doc. 17-1 at 5.

To address the COVID-19 pandemic, the United States Centers for Disease Control and Prevention ("CDC") issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities." Doc. 17-4; Doc. 24-2. In an effort to prevent or mitigate the introduction and spread of COVID-19 in these facilities, the CDC recommends that several steps be taken, including but not limited to:

> (1) restricting or suspending the transfers of detained persons and to subject any transfers to medical isolation to evaluate if COVID-19 testing is appropriate; (2) quarantining all new inmates for 14 days before they enter into the general population; (3) cleaning and disinfecting surfaces that are frequently touched multiple times per day, including the use of disinfectants effective against the virus; (4) providing detainees, at no cost, with soap, running water, and hand drying machines or paper towels; (5) implementing social distancing strategies to increase the physical space between each detained person; and (6) medically isolating confirmed or suspected COVID-19 cases.

*Archilla v. Witte*, No. 4:20-CV-596-RDP-JHE, 2020 WL 2513648, at *3 (N.D. Ala. May 15, 2020). The CDC's guidance is subject to adaptation for specific institutional settings "based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Doc. 17-4 at 2; Doc. 24-2 at 3.

Defendants maintain that they follow the CDC's guidelines, from both a medical and security perspective, and contend that they have taken many steps to combat the spread of COVID-19 through ADOC facilities:

From the outset of the pandemic in March 2020, ADOC worked to create and implement a plan to respond to the COVID-19 pandemic, both system wide and at Ventress. [Doc. 24-1 at ¶ 7; Doc. 24-3 at ¶ 6]. ADOC focused its efforts on operational preparedness, education, increased cleaning and disinfection of facilities, screening, restriction of movement into facilities, and securing and distributing hygiene, cleaning, and medical supplies. [Doc. 24-1at ¶ 7; Doc. 24-3 at ¶ 6]. Additionally, ADOC created specific local teams identified as Pandemic Planning Teams at a facility level to implement protective measures to mitigate inmate and staff exposure. [Doc. 24-1 at ¶ 7].

[] Beginning in early March 2020, recognizing the threat of COVID-19, ADOC developed a plan of action to combat the spread of COVID-19 and to protect the inmates and staff. As part of ADOC's efforts to reduce the spread of COVID-19, it initiated an education and communication strategy directed to both staff and inmates. [Doc. 24-1 at ¶ 8; Doc. 24-3 at ¶ 6]. These communications consisted of documents and information developed by ADOC's Office of Health Services ("OHS") and the CDC. [*Id*.]. The materials provide basic information on COVID-19, such as what it is, how it spreads, and the common symptoms. [*Id*.]. Additionally, the documents describe the best methods for protecting oneself and how to help prevent the spread of the virus. [*Id*.]. These measures include proper hygiene practices, identifying the signs and symptoms of COVID-19, social distancing, and identifying methods for addressing stress associated with the virus. [*Id*.].

[] In addition to educating staff and inmates, ADOC has taken a number of proactive steps to curb the spread of COVID-19. ADOC, consistent with CDC Guidance, temporarily suspended new intakes[8] and modified the intake process. [Doc. 24-1 at ¶ 9; Doc. 24-3 at ¶ 6]. Additionally, ADOC suspended all outside visitors from entering any facility, and implemented a screening procedure prior transferring inmates between ADOC facilities. [Doc. 24-1 at ¶ 9; Doc. 24-3 at ¶ 6].

For staff, ADOC implemented a pre-work screening procedure and a process for employees who call-in sick. [Doc. 24-1 at ¶ 9; Doc. 24-3 at ¶ 6]. Prior to entering the facility, officers must answer a series of questions and have their temperature checked. [*Id*.]. If an officer calls in with an illness, the officer must respond to specific screening questions, and each facility must maintain a log to track all illness related absences. [Doc. 24-1 at ¶ 10].

---

[8] ADOC temporarily halted new intakes on March 20, 2020 for a minimum of 30 days to allow it to create an intake procedure that will allow for a 14-day quarantine to help prevent infected inmates from being introduced into the population. [Doc. 24-1 at ¶¶ 9, 14, 15, 18].

To provide for a clean environment, ADOC resourced and provided to all facilities, including Ventress, cleaning supplies with instructions for cleaning the facilities and a specific checklist for cleaning kitchens. [Doc. 24-1 at ¶ 11; Doc. 24-3 at ¶ 6]. ADOC acquired and distributed facemasks for officers and inmates. [Doc. 24-1 at ¶ 12; Doc. 24-3 at ¶ 8]. The facemasks provided to inmates include instructions for care and cleaning of the masks, and a written acknowledgment form signed by the inmate acknowledging receipt or refusal of the masks. [Doc. 24-1 at ¶ 12; Doc. 24-3 at ¶ 6].

[] In addition to specific movement restrictions, education, and staffing restrictions, ADOC created and implemented protocols for testing inmates suspected of being COVID-19 positive, and quarantining and medically isolating inmates directly exposed to or testing positive for COVID-19. Decisions on whether to test an inmate rests with medical personnel based upon criteria developed by ADOC from CDC Guidance, and in coordination with the three (3) level quarantine protocol.

Quarantine and testing occur based on a three (3) tiered system. [Doc. 24-1 at ¶ 18]. Level one, also known as "watchful wait," requires inmates suspected of exposure to a COVID-19 positive person to be isolated from the general population and monitored for fever and other symptoms of COVID-19. Level one does not require testing. [*Id.*]. Level two requires an inmate who exhibits signs or symptoms of COVID-19 or has confirmed prolonged direct exposure to a person who has tested positive to be isolated and tested for COVID-19. [*Id.*]. Level three requires medical quarantine for any inmate who tests positive for COVID-19. [*Id.*].

In an effort to provide medical care and operate in a reasonable and efficient manner, ADOC established a medical quarantine area at Ventress to accommodate several facilities. [Doc. 24-3 at ¶ 5]. Inmates, including inmates from Easterling Correctional Facility, have been and will be transferred to Ventress for medical quarantine. [Doc. 24-3 at ¶ 5]; Declaration of Celeste Hunter [Doc. 17-1 at 5]. The location within the Ventress grounds allowed ADOC to maintain separation of the COVID-19 positive inmates from the general population, and provide necessary medical care for infected inmates. [Doc. 24-3 at ¶ 5]; Declaration of Celeste Hunter [Doc. 17-1 at 5]]. Inmates in the medical quarantine area must remain in the specific location. [Doc. 24-3 at ¶ 5]. ADOC provides all necessary services, including meals and medical care, to the inmates within the medical quarantine area. [Doc. 24-3 at ¶ 5]. No other inmates, including Plaintiff, have or ever had access to medical quarantine area or inmates within the quarantine area. [*Id.*].

[] While ADOC's administration and OHS have worked tirelessly to curb the spread of COVID-19 system-wide, Warden Butler and Ventress staff engaged in the fight on the frontlines. [Doc. 24-3 at ¶ 6]. Warden Butler, supported by Naglich, stated that she and her staff have conducted or overseen the following preventative actions and measures at Ventress:

a.  educating inmates and staff through oral and written communications, including signage, about symptoms of COVID-19, proper hygiene practices, and social distancing;

b.  encouraging inmates and staff to engage in proper hygiene practices and social distancing;

c.  providing and restocking antibacterial soap in bathrooms and housing areas and hand sanitizer in main hallways and dining areas to allow frequent hand-washing;[]

d.  continuing medical appointments such as chronic care clinics and sick-call appointments;

e.  suspending copays for inmates seeking medical services;

f.  implementing intensified cleaning and disinfecting procedures;

g.  suspending the intake of new inmates and, when restarted, ensuring an appropriate quarantine and screening before transferring the new intakes from a temporary intake facility to a permanent intake facility;

h.  performing verbal screening and temperature checks for all persons entering the facility and, if a person has a temperature over 100.4 degrees Fahrenheit or other symptoms of COVID-19, denying the person entry into the facility;

i.  implementing social distancing strategies;

j.  providing masks to each inmate (and a replacement if these initial masks are misplaced or destroyed), along with instructions on wearing, cleaning, and caring for the masks;

k.  providing masks and gloves to administrative and correctional staff, along with instructions on wearing, cleaning, and caring for the masks;

l.   implementing a quarantine or medical isolation plan for any inmate or staff who tests positive for COVID-19 or is suspected of having or being exposed to COVID-19;

m.   monitoring inmates for symptoms of COVID-19 such as cough and shortness of breath or at least two (2) of fever, chills, repeated shaking with chills, muscle pain, headache, sore throat, and new loss of taste or smell; and

n.   testing inmates for COVID-19 with symptoms of COVID-19 or contact with a person testing positive for or suspected of having COVID-19.

[Doc. 24-1 at ¶ 17; Doc. 24-3 at ¶ 6].[]

To provide a clean environment, Warden Butler established a cleaning schedule that requires all surfaces, including bathrooms and living areas, to be cleaned and sanitized at least two (2) times per shift, for a total of six (6) cleanings per day. [Doc. 24-3 at ¶ 7]. In addition, Warden Butler implemented social distancing measures at Ventress, suspending congregational services, prohibiting religious and educational personnel from entering the facility, and requiring inmates to maintain at least six (6) feet distance while standing in line for meals, phones, or any other matter. [*Id.* at ¶ 8]. These efforts are on top of the system-wide restrictions that began in March 2020, suspending all outside work in the community, and all visitation. [Doc. 24-3 at ¶ 6].

ADOC Officials['] tireless efforts continue to keep the spread of COVID-19 contained at Ventress. As of January 12, 2021, only nineteen total inmates have tested positive over the time of the pandemic and no inmates remain actively positive. Similarly, only 35 staff members tested positive with only one remaining active or positive. [Doc. 24-3 at ¶ 9].

Doc. 24 at 6–12.

When he filed this action, Clarke had exhibited no signs or symptoms of COVID-19. Doc. 17-1 at 3; Doc. 17-2. Nurse Hunter testifies that Clarke had no medical issues that would be negatively affected by the virus and that at no time were his medical needs delayed or denied. Doc. 17-1 at 4. As to Clarke's allegation that he was denied access to mental health for mental stress (Doc. 1 at 8), Defendant Butler testifies that mental health

services remained ongoing at Ventress during the relevant period. Doc. 24-3 at 5. Mental health staff saw inmates if they submitted written requests for mental health care or treatment or if they were referred for mental health services. *Id.* Clarke's medical records do not reflect that he submitted any requests for mental health care or treatment before filing this action. *See* Doc. 17-2; *see also* Doc. 17-1.

## IV.   DISCUSSION

### A.   Sovereign Immunity

Defendants Dunn, Price, Butler, and Crow ("the correctional defendants") assert that Clarke's suit is barred by Eleventh Amendment immunity to the extent it seeks to recover monetary damages against them in their official capacities.[9] Doc. 25 at 11–12.

Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). A state official thus may not be sued in his or her official capacity unless the State has waived its Eleventh Amendment immunity, *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100

---

[9] Defendant Hunter filed an Answer (Doc. 10) asserting, among other things, sovereign and qualified immunity. She did not rely on these defenses in her special report, and furthermore, her briefing indicates she worked for Wexford, the prison healthcare contractor, at the time of the challenged conduct. Doc. 17-1 at 2. Thus, as an employee of the contract healthcare contractor, Defendant Hunter's qualified immunity argument would be foreclosed by *Hinson v. Edmond*, 192 F.3d 1342, 1345 (11th Cir.1999), *amended*, 205 F.3d 1264 (11th Cir. 2000). In *Hinson*, the Eleventh Circuit relied upon the reasoning of *Richardson v. McKnight*, 521 U.S. 399 (1997), where the Supreme Court declined to extend qualified immunity to privately employed prison guards, to hold that qualified immunity may not be extended to privately employed prison physicians. Based on *Hinson*, Defendant Hunter cannot claim the protection of qualified immunity. In addition, for similar reasons that the *Hinson* and *Richardson* courts declined to extend the doctrine of qualified immunity, Defendant Hunter is not entitled to sovereign immunity as it is reserved for the State and its employees.

(1984), or Congress has abrogated the State's immunity, *see Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 59 (1996). With respect to the types of claims now being asserted by Clarke, it has been recognized that "Alabama has not waived its Eleventh Amendment immunity in § 1983 cases, nor has Congress abated it." *Holmes v. Hale*, 701 F. App'x 751, 753 (11th Cir. 2017) (*citing Carr v. City of Florence, Ala*., 916 F.2d 1521, 1525 (11th Cir. 1990)). Accordingly, the correctional defendants are entitled to sovereign immunity as to all claims seeking monetary damages against them in their official capacities. *See, e.g., Selensky v. Alabama*, 619 F. App'x 846, 849 (11th Cir. 2015) ("[T]he Eleventh Amendment prohibits federal courts from entertaining suits by private parties against States and their agencies [or employees]."); *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277  (11th Cir. 1998) (holding that state officials in their official capacities are protected under the Eleventh Amendment from suits for damages); *Edwards v. Wallace Cmty. Coll.*, 49 F.3d 1517, 1524 (11th Cir. 1995) (holding that damages are unavailable from state official sued in his official capacity).

### B.    Qualified Immunity

To the extent Clarke sues the correctional defendants in their individual capacities, they argue they are entitled to qualified immunity. Doc. 25 at 12–13. Qualified immunity offers complete protection from civil damages for government officials sued in their individual capacities if the underlying conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity is not merely a defense against liability but immunity from

suit, and the Supreme Court "repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009) (citation and internal quotation marks omitted).

To receive qualified immunity, a defendant first must prove that he or she was acting within the scope of discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). There is no dispute that the correctional defendants were acting within the course and scope of their discretionary authority when the challenged conduct occurred. The burden therefore shifts to Clarke to present evidence that the correctional defendants are not entitled to qualified immunity. *See e.g., Powell v. Snook*, 25 F.4th 912, 920 (11 Cir. 2022); *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

To meet this burden, Clarke must show two things: (1) that the correctional defendants committed a constitutional violation and (2) that the constitutional right the correctional defendants violated was "clearly established. *Powell*, 25 F.4th at 920; *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right. ... In other words, existing precedent must have placed the statutory or constitutional question beyond debate." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citations and quotation marks omitted) (alteration in original); *Corbitt*, 929 F.3d at 1311. The court may analyze the elements "in whatever order is deemed most appropriate for the case," and a finding of qualified immunity is appropriate if sufficient evidence has

not been presented as to any one of the elements. *Rehberg v. Paulk*, 611 F.3d 828, 839 (11th Cir. 2010) (citing *Pearson*, 555 U.S. at 241-42).

### C.   Conditions of Confinement

#### 1.   Request for Damages

As an initial matter, the Court notes that Clarke seeks well over $900,000 in monetary damages. Doc. 1 at 11–12. Clarke's Complaint neither alleged nor provided any evidence of a physical injury stemming from the events described in the Complaint or a sexual act as defined in 18 U.S.C. § 2246(2). *See Id.* (providing that he suffered "emotional, mental, and psychological stress," "fear," and "worry," but no actual physical harm). The correctional defendants argue that since Clarke claimed no physical injury for the conduct challenged in the Complaint, he cannot recover compensatory damages. Doc. 25 at 10–11. Although § 1997e(e) is a limitation on recovery of compensatory damages, in *Hoever v. Marks*, 993 F.3d 1353, 1362 (11th Cir. 2021), the Eleventh Circuit, determined that the PLRA "does not bar punitive damages in the absence of physical injury," overruling prior precedent to the contrary. The court held that the plain text of "§ 1997e(e) permits claims for punitive damages without a physical injury requirement." *Id.* at 1364. Thus, under *Hoever*, and to the extent Clarke's Complaint is considered to assert a claim for punitive damages, he can do so without an allegation that he suffered any physical injury.

#### 2.   Deliberate Indifference

Construed liberally, Clarke's contentions regarding the management of COVID-19 at Ventress raise claims regarding conditions of confinement. The Court therefore addresses Clarke's allegations regarding Defendants' conduct and actions in response to

transferring COVID-19 positive inmates to Ventress and the pandemic in general as well as the limitations associated with the ability to engage in social distancing,  overcrowding, and excessive temperatures, under the Eighth Amendment. *See Haines v. Kerner*, 404 U.S. 519, 520-521 (1972) (stating that pro se filings should be liberally construed).

The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" because of its guarantee against cruel and unusual punishment. U.S. Const, amend. VIII; *see  Estelle v. Gamble*, 429 U.S. 97, 102 (1976). It "proscribes more than physically barbarous punishments" and "embodies" the "'concepts of dignity, civilized standards, humanity, and decency ...'" *Id.* at 103 (quotation marks and citations omitted). Under the Eighth Amendment, prison officials have a duty to "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). A prison official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer*, 511 U.S. at 837.

To survive summary judgment on a conditions of confinement claim, a plaintiff must satisfy both an objective and subjective component.  *Farmer*, 511 U.S. at 834; *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (holding that the law requires establishment of both objective and subjective elements to demonstrate an Eighth Amendment violation). Under the objective prong, the plaintiff must show "a

substantial risk of serious harm." *Brooks v. Warden*, 800 F.3d 1295, 1301 (11th Cir. 2015) (citation omitted).  In *Swain v. Junior*, the Eleventh Circuit acknowledged "that the risk of COVID-19 satisfies this requirement." 961 F.3d 1276, 1285 (11th Cir. 2020). Under the subjective prong, the plaintiff must prove a defendant's "deliberate indifference" to that risk by making three sub-showings: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."[10] *Id.* (citation omitted).

### 3.     COVID-19 Claims

Defendants seem to concede "subjective knowledge" of the risk posed by COVID-19.  *See, e.g.,* Doc. 25 at 5 ("ADOC Officials recognized the danger created by COVID-19."). Therefore, Clarke's claims hinge on whether Defendants disregarded that risk through conduct that was more than mere negligence. *See Swain*, 961 F.3d at 1285; *Helling v. McKinney*, 509 U.S. 25, 35-37 (1993) (finding that a plaintiff may state an Eighth Amendment claim against prison officials based on conditions that, objectively, "pose an unreasonable risk of serious damage to his future health" if he shows that "he himself is being exposed" to the potential health risk and that, subjectively, "prison authorities are ignoring the possible dangers posed by exposure"). The conduct, however, "must involve more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*,

---

[10] The undersigned notes that in a recent Eleventh Circuit decision addressing the deliberate indifference standard in the context of an inmate's claim of inadequate medical treatment, the court observed that "[o]ur cases say both that the standard is 'more than mere negligence' and that it is 'more than gross negligence.'" *Johnson v. Lewis*, 83 F.4th 1319, 1327 n.2 (11th Cir. 2023) (comparing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) with *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010)).

475 U.S. 312, 319 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, which characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id*.

Although Clarke argues Defendants showed deliberate indifference to his health and safety by: (1) unnecessarily transferring COVID-19 positive inmates to Ventress from Easterling based on the close proximity between the two facilities; (2) transferring inmates from Ventress in contravention of CDC guidelines; (3) failing to stop, stem, or slow the spread of COVID-19 where, other than conducting one mass testing event, no testing was conducted under CDC guidelines; (4) making social distancing impossible due to overcrowding; (5) enabling a protentional a "super spreader" event through a "watchful wait" protocol; (6) failing to have a filtered ventilation system to prevent exposure of the entire prison population to the virus; and (7) allowing an inmate who tested positive for "pneumonia coronavirus" at an offsite medical appointment to be returned to population (Docs. 37, 37-1), he has largely failed to refute Defendants' evidence. Rather Clarke asserts no more than broad assertions that Defendants acted unreasonably by the mere act of transferring COVID-positive inmates from Easterling to Ventress, by failing to achieve social distancing within the prison, and by failing to be consistent and efficacious in their application of CDC guidelines regarding management of COVID-19 at Ventress.

In *Swain*, the Eleventh Circuit addressed the deliberate indifference standard as it applies to the management of COVID-19 in a prison setting:

> [E]ven while the district court seemed to assume a state of affairs in which the defendants had taken numerous measures to combat the virus, it held that the defendants were nonetheless deliberately indifferent based on two

considerations: (1) the increase in the rate of infections ... and (2) the lack—and seeming impossibility—of meaningful social distancing at the facility. In so concluding, the district court erred. Neither the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that the defendants acted with "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839-40 ... (quotation omitted).

First, and most obviously, the district court erred in relying on the increased rate of infection. On this point, the Supreme Court's decision in *Farmer* couldn't be any clearer: "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*." *Id*. at 844 ... (emphasis added). A resulting harm thus cannot alone establish a culpable state of mind. *Cf. Wilson v. Seiter*, 501 U.S. 294, 303 ... (1991) (stating that "the 'wantonness' of conduct" doesn't "depend[] upon its effect upon the prisoner"); *Wilson v. Williams*, No. 20-3447, 961 F.3d 829, 842–43 (6th Cir. June 9, 2020) (rejecting the contention that "the [Bureau of Prisons] was deliberately indifferent to petitioners' health and safety because [its] actions have been ineffective at preventing the spread of COVID-19").

Second, and separately, the district court erred in concluding that the defendants' inability to ensure adequate social distancing constituted deliberate indifference. The court stated no less than eight times in its order that adequate social distancing was "not possible" or "impossible." [] [However,] [f]ailing to do the "impossible" doesn't evince indifference, let alone deliberate indifference.

*Id*. at 1287. Upon finding that failure to stop the spread of COVID-19 and failure to

adequately social distance does not amount to deliberate indifference, the court then turned

to the measures taken by the defendants to mitigate the spread of the virus:

[T]he [court-commissioned expert] report observed that the defendants put "tape on the floor to encourage social distancing in lines," that "bunks are staggered with head to foot configuration" in order to maximize the distance between faces during sleep, and that "[p]atients are staggered and appropriately distanced when going to medical." Importantly, we think, while the report noted some social-distancing violations, it concluded that [the facility's] administrators and employees were "doing their best balancing social distancing and regulation applicable to the facility," and that they "should be commended for their commitment to protect the staff and the

inmates." It's worth noting, though not determinative, that the CDC's guidance—on which the district court relied heavily—presupposes that some modification of its social-distancing recommendations will be necessary in institutional settings. The guidance states in bold-face type, on the very first page, that it "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Regarding social distancing specifically, it says that while there should "ideally" be six feet between inmates, "[s]trategies will need to be tailored to the individual space in the facility and the needs of the population and staff," and that "[n]ot all strategies will be feasible in all facilities." It therefore offers "strategies with varying levels of intensity," such as—importantly here, because the defendants claimed to have done so—"[a]rrang[ing] bunks so that individuals sleep head to foot to increase the distance between them."

Moreover, the defendants have represented that they took numerous *other* measures—besides social distancing—to mitigate the spread of the virus. The district court summarized a few of them:

- "requiring staff and inmates to wear face masks at all times (other than when sleeping)";
- "conducting screening for all staff entering the facility";
- "conducting daily temperature screenings for all inmates";
- "suspending all outside visitation"; and
- "providing disinfecting and hygiene supplies to all inmates."

…The court assumed, for the sake of its deliberate-indifference analysis, at least, that the defendants *had* implemented these measures, but nonetheless concluded, as a matter of law, that they must have been inadequate because (1) the rate of infections rose and (2) social distancing—which it took to be the most critical measure—wasn't possible.[]

*Id*. at 1288-89 (citations to the record omitted). Finally, the court held:

Whatever deliberate indifference is, the defendants' conduct here doesn't show it. The district court erred in holding that the defendants acted with a deliberately indifferent mental state, equivalent to "subjective recklessness as used in the criminal law." *Farmer*, 511 U.S. at 839-40 ... . We simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by "doing their best." Because the defendants "act[ed] reasonably," they "cannot be found liable" under the Eighth Amendment. *See id.* at 845 [.]

*Id.* at 1289.

As the foregoing reflects, one is not deliberately indifferent simply because his or her conduct is ultimately ineffective at preventing the spread of COVID-19. *See Swain*, 961 F.3d at 1287–88 (explaining that the court's focus must not be on "isolated failures– or impossibilities, … but … on the defendants' entire course of conduct."). Nor is one deliberately indifferent by failing to do the impossible, such as maintaining perfect social distancing in a confined space like a correctional facility. *Id.*

Like in *Swain*, the undersigned finds that Defendants' conduct does not rise to the level of deliberate indifference. Defendants provided substantial evidence detailing the many steps prison authorities have taken to mitigate the spread of COVID-19 throughout the prison system and, specifically, at Ventress. Without repeating each step, which are provided above, Defendants have shown they took significant measures to implement precautions to protect inmates at Ventress from the virus as recommended by the CDC, including—but not limited to—restricting the six inmates transferred from Easterling to medical quarantine in a designated area isolated from other inmate; educating inmates and staff regarding COVID-19; frequent and enhanced cleaning of bathrooms and living areas; distribution of masks and replacement masks; encouragement of social distancing of staff and inmates; limiting inmate movement within the facility; and implementation of a three-tiered system regarding testing and quarantine. These wide-ranging and ongoing protective measures and protocols developed by the ADOC and the prison healthcare contractor that were implemented at Ventress reflect that Defendants took a myriad of steps to reduce the spread of COVID-19 to protect Clarke and other inmates housed at Ventress as

recommended by the CDC. Moreover, there is no evidence that Clarke ever contracted COVID-19 nor do his medical records show any report by medical staff indicating that Clarke contracted COVID-19 or that he exhibited (or claimed to have) symptoms. *See* Docs. 17-1, 17-2.

There is nothing in the record to suggest that Defendants acted less than reasonably under the circumstances with which they were faced. *See e.g.*, *Swain,* 961 F.3d at 1287 (explaining that "[n]either the resultant harm of increasing infections nor the impossibility of achieving six-foot social distancing in a jail environment establishes that defendants acted with subjective recklessness."). Like the Eleventh Circuit in *Swain*, this Court "simply cannot conclude that, when faced with a perfect storm of a contagious virus and the space constraints inherent in a correctional facility, the defendants here acted unreasonably by 'doing their best.' " *Id.* at 1289.

Regarding the claim concerning a denial of medical care, Clarke vaguely alleges that Defendant Hunter denied him "access to mental health for mental stress" and denied him temperature checks. Doc. 1 at 8; Doc. 1-1. Clarke provides no further detail regarding his first allegation, such as when he may have sought treatment, from whom, or how or why this treatment was denied. *See Id.* Additionally, there is no evidence Clarke sought or asked for mental health to care or treatment before filing this action. Docs. 17-1, 17-2. His bare allegation of being denied "access to mental health," without more, is insufficient to overcome summary judgment. *See Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (holding that "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

As to Clarke's second allegation, that he did not receive COVID-19 testing or regular temperature checks, he identifies no specific individual from whom he sought medical care—much less that he sought care from Defendant Hunter—or provide any allegations or evidence he required such medical care during the relevant period. The undisputed evidence shows an inmate's temperature will be checked in one of three circumstances—if the inmate develops symptoms of COVID-19, if the inmate goes off-site for an appointment or procedure, or if the decision is made from the OHS to conduct mass testing. Doc. 17-1 at 5–6. No evidence has been presented that  Clarke ever showed any signs or symptoms of COVID-19 or contracted COVID-19 before this action. *See* Docs. 17-1, 17-2. Thus, Clarke's bare allegations regarding denied medical care fail to establish deliberate indifference by Defendant Hunter.

### 4.    Other Conditions Claims

Clarke claims his health and safety were jeopardized by overcrowding at Ventress, the inability to engage in social distancing (especially in the dining hall), and high temperatures in the dorms. Doc. 1 at 6. These conditions, Clarke claims, made Ventress an "incubator for growing bacteria and diseases" which constantly put his life in danger. *Id.* No evidence has been produced that Clarke complained to Defendants, or any correctional staff at Ventress about the challenged conditions nor do his medical records reflect he suffered any harm because of them.

Although Clarke presents allegations regarding overcrowding and unsafe conditions, he does not establish that these conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of

23

pain. *Wilson*, 501 U.S. at 298-299; *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). In addition, Clarke has produced no evidence which shows Defendants knew of a risk of serious harm to him regarding the conditions about which complains and disregarded that risk. *Farmer*, 511 U.S. at 837-38. The mere fact the challenged conditions existed is not enough.

Because Clarke has not made a showing of deliberate indifference by Defendants Dunn, Price, Crow, and Butler, they are entitled to qualified immunity, and their motion for summary judgment on Clarke's Eighth Amendment deliberate indifference claims is due to granted. Because Clarke has also failed to make a showing of deliberate indifference by Defendants Hunter and Wexford Health Sources, Inc., their motion for summary judgment on Clarke's Eighth Amendment deliberate indifference claims is likewise due to be granted.

### D.    Equal Protection

Construing Clarke's *pro se* pleading liberally, it appears he also purports to bring a Fourteenth Amendment equal protection claim based on Defendants' conduct in transferring COVID-positive inmates to Ventress. To the extent Clarke intends to establish such a claim, he has not done so. To overcome summary judgment on an equal protection claim, Clarke must show (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) his discriminatory treatment was based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946–47 (11th Cir. 2001). Clarke has done neither. He has neither alleged nor provided any evidence of the existence of any similarly situated prisoners who received more favorable

treatment than him or that he was somehow discriminated against based on a constitutionally protected basis. Accordingly, Defendants Dunn, Price, Crow, and Butler are entitled to qualified immunity, and their motion for summary judgment on Clarke's Fourteenth Amendment equal protection claims is due to granted. The motion for summary judgment filed by Defendants Hunter and Wexford Health Sources, Inc., on Clarke's Fourteenth Amendment equal protection claims is likewise due to be granted.

### E.   **Wexford Health Sources, Inc**.

If the Court construes Clarke's Complaint to assert that Wexford had a policy or custom that resulted in deliberate indifference, this claim is unavailing. Clarke not only alleges no facts supporting such a finding, but he identifies no policy or custom that led to any injury.

Generally, "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (citation and internal quotation marks omitted). The Eleventh Circuit has extended that rule to private corporations like Wexford. *See, e.g., Craig v. Floyd Cnty., Ga*., 643 F.3d 1306, 1310 (11th Cir. 2011). Where the state and the entity enter a contractual agreement, the private healthcare company is a "person" acting under color of state law and may be liable under § 1983. *Howell v. Evans*, 922 F.2d 712, 723–24 (11th Cir.), *vacated pursuant to settlement*, 931 F.2d 711 (11th Cir. 1991), *and opinion reinstated sub nom. Howell v. Burden*, 12 F.3d 190 (11th Cir. 1994) (internal citation omitted). Through the contract, the private entity also "performs a function traditionally within the exclusive prerogative of the state and becomes the functional

equivalent of the municipality under section 1983." *Craig*, 643 F.3d at 1310 (citation and internal quotation marks omitted). Under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (holding that a municipality cannot be held liable on a theory of respondeat superior), a private entity providing medical services to inmates under a contract with the state is only liable under § 1983 when it employs a custom or policy constituting deliberate indifference to an inmate's serious medical need. *See Howell*, 922 F.2d at 724 n.13 (noting that the policy or custom analysis applied to a corporation is the same as the analysis applied to municipalities under *Monell*). To hold a defendant liable as a supervisory official, a plaintiff must show that "the supervisor personally participate[d] in the alleged constitutional violation or [that] there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Hartley*, 193 F.3d at 1269.

The challenged policy or custom need not be express. A policy is "a decision that is officially adopted" or created on behalf of the entity. *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997). A custom is any practice that is "so settled and permanent" as to carry the force of law. *Id*. To establish the existence of a custom, the evidence must show more than an isolated incident leading to constitutional injury and, instead, reflect the pattern is widespread. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004). To show the practice at issue is sufficiently widespread to constitute a custom, a plaintiff ordinarily must produce evidence that the practice resulted in deficient treatment of other inmates. See *Craig*, 643 F.3d at 1312. Ultimately, the plaintiff must produce sufficient evidence of a "series of constitutional violations from which deliberate indifference can be

inferred." *Id.* (quoting *Est. of Novack ex rel. Turbin v. Cnty. of Wood*, 226 F.3d 525, 531 (7th Cir. 2000)).

Here, Clarke has produced insufficient evidence to show a genuine dispute of material fact as to any policy or custom of Wexford reflective of deliberate indifference to his health and safety regarding COVID-19. *See Craig*, 643 F.3d at 1310 (explaining that to impose liability under § 1983 a plaintiff must prove that a municipality had a "policy or custom" of deliberate indifference that led to the violation of his constitutional right). Accordingly, Wexford's motion for summary judgment is due to be granted on this claim.

## V.   CONCLUSION

Based on the foregoing, the undersigned RECOMMENDS that:

1.      Defendants' Special Reports (Docs. 17, 25) be CONSTRUED as motions for summary judgment and the motions be GRANTED in favor of Defendants on all claims;

2.      This case be DISMISSED with prejudice.

Further, it is ORDERED that by **February 6, 2024,** the parties may file objections to this Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which objection is made. Frivolous, conclusive, or general objections will not be considered by the Court. The parties are advised that this Recommendation is not a final order and, therefore, is not appealable.

Failure to file written objections to the Magistrate Judge's findings and recommendations in accordance with 28 U.S.C. § 636(b)(1) will bar a party from a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waive the right of the party to challenge on appeal the District

Court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except on grounds of plain error or manifest injustice. *Resol. Tr. Corp., v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11TH CIR. R. 3-1

      DONE, this 23rd day of January, 2024.

                    /s/ Stephen M. Doyle
                    STEPHEN M. DOYLE
                    CHIEF UNITED STATES MAGISTRATE JUDGE